six more days until Christmas. So hope it's a good one. Welcome to the U.S. Court of Appeals. We've got two cases this morning. We're going to start off with 23-50668 Book People v. May it please the court. Despite plaintiff's inflammatory rhetoric, reader is not a book ban. Far from it. Texas's new law simply protects parents' rights to decide what materials their children will read in the public school library. And it promotes the state's interest in preventing those very same school from being exposed to harmful, sexually explicit material at taxpayer expense. Reader does not implicate the free speech clause of the First Amendment. And no plaintiff has suffered a First Amendment injury because of this law. But the court does not need to get into the merits of this case because plaintiff's claims are barred for three related reasons. Ripeness, standing, and sovereign immunity. The simplest way for this court to resolve plaintiff's claims is to determine that they are not yet ripe. Because ripeness provides the most direct path forward, that is where I'll begin. Plaintiff's claims stem from three alleged harms. Future and imminent economic harm, future and imminent constitutional harm, and future reputational harms. As the state has briefed, these harms, these alleged harms, are not sufficient to constitute an injury in fact, but I will turn to that point when we get to standing. For now, I want to focus on the closest calls with these claims, the ones that come closest to actually providing plaintiffs a right claim. The harms that come closest to providing a right claim are plaintiff's imminent economic and constitutional harms. Here, plaintiffs allege that they will suffer imminent harms because section 35.002 urges vendors to do a few things. To review and rate materials that they have previously sold to school districts, to recall any sexually explicit materials that they previously sold to school districts and are inactive use, and by April 1st to disclose to the agency a list of sexually explicit materials and relevant and sexually relevant materials that they have previously sold to school districts and are inactive use. Plaintiffs allege that reviewing and recalling previously sold materials will impose significant economic harm and then they allege that conducting the initial ratings and providing the April 1 disclosure will constitute compelled speech, their constitutional harms. Plaintiff's argument here fails for four reasons. First, these provisions under section 35.002 pertain to voluntary actions. The vendors can choose to opt out of these, out of this provision entirely. That would eliminate the plaintiff's claim that they have any mandatory costs associated with compliance or that these provisions compel their speech. Then they won't be able to sell to the school, is that correct? Thank you, Judge Douglas. As the law is written, the school districts are that appear on the agency's list, which appears in section 35.003 of the law. 35.003 of the law actually does not relate to 35.002 of the law. Plaintiffs are alleging that there is some enforcement authority by the agency under 35.003. They are conflating those two sections, attempting to pull any enforcement authority that they can from that later provision and pull it into 35.002. Noncompliance with 35.002 does not automatically put a vendor on the agency's later noncompliance list. It also does not save a vendor from appearing on that list. Those two sections have nothing to do with each other. When we're talking about their imminent alleged harms, which again, as I said, that provides the closest call for them to actually have a right claim. Well, while you're on 33, what is the relationship between the library standards portion of the statute 33.021 and the rating requirement portion, which is 35.001? If I understand Your Honor's question correctly, you are looking into 35.001. For these literary standards? Under section 35.001. Is that correct, Your Honor? Well, what is the vendor requirement of 35.001? There is no vendor requirement under that section and it is important to note before this court, that section was not enjoined by the district court. So as far as the state is aware, that section is, that provision is not before this court for consideration. And there's no relationship between? There certainly is a relationship as we read the law contextually. Section 35.001 refers to the library standards that goes to the commission's duty to provide those standards to school districts and to help school districts comply with their duties under this law. Certainly that section does relate to the rating requirement, but again, because that is not enjoined, that is not before this court today. So we'll stick with section 35.002, which as I stated, does provide the closest call for them to allege any ripe claims. Unfortunately, they fail there for the reasons, for four reasons. One, we already discussed, it's voluntary action. The second is a related reason. There is actually no enforcement mechanism under this statute. I was just discussing that with Judge Douglas. The enforcement, if there is any under this law, it is in 35.003. And plaintiffs are attempting to conflate those two sections to provide enforcement under this part of the list. That part of the law, again, has nothing to do with this section. And so plaintiffs fail to provide any actual enforcement under the voluntary standards. Third, plaintiffs' alleged compliance costs that are associated with reviewing and recalling any sexually explicit materials likely reflects a pre-enforcement incentive that the plaintiffs already had under this law. If we look to this court's decision in Net Choice from just last year, the court indicated that pre-enforcement incentive to conduct the activity that is regulated by the law does not otherwise rise to the level of a harm. And fourth, Your Honor, is the initial ratings and that April 1st disclosure will not even apply to a plaintiff or any vendor who does not sell sexually explicit materials to school districts. Of course, the plaintiffs in this case... I'm sorry, Your Honor? The plaintiffs did not apply to vendors who do not sell sexually explicit materials? Yes. That would be defined under the law. So it's defined in Reader, and it's also tied to the Penal Code definitions for the words sexually explicit and sexually relevant. Which one specifically? You said it's defined by Reader. Where in Reader is it? Yes, of course. It is defined in Section 33.021. That defines sexually explicit material. It's referenced, again, in 35.001, the definition section, references sexually explicit material. It also references there the sexually relevant material that Your Honor is inquiring about. So the definition under the Penal Code defines it as material that is patently offensive. Is that term, and that term is also defined in Reader? That term is also defined in Reader. It's also defined in the Penal Code. In Section 43.201 of the Penal Code. It looks like patently offensive refers to current community standards of decency. Is that term defined? That term is referenced in existing case law. We look to the Miller v. California case to determine that a statewide community standard is an acceptable and constitutional use under an obscenity inquiry, Your Honor. I do want to turn to the next jurisdictional bar that plaintiffs face. Even if this court determines that plaintiffs' claims are ripe, which they are not, plaintiffs still cannot establish standing. Of course, this is a related inquiry. Ms. Jackson, let me interrupt for a second. You've got about a little under six minutes on your first presentation. Unless my colleagues have other questions on ripeness or standing or sovereign immunity, why don't you leapfrog and get to the merits? Absolutely. Thank you. Judge Willett. Even if this court determines that there is jurisdiction to consider these claims, which again, the state argues that there is not, plaintiffs have failed to allege a constitutional violation for at least four reasons. First, plaintiffs' claims do not implicate the free speech clause of the First Amendment. As we were just discussing in Miller v. California, the Supreme Court indicated that obscenity is not subject to First Amendment scrutiny. That is especially true here where we are in a vulnerable public school context. Your Honor, second, if it involves speech at all, it involves government speech that lies outside of the bounds of the First Amendment. Plaintiffs insist that the initial uncorrected ratings list will somehow be confused as as plaintiffs' own speech, not of the government. This assumption is wrong, especially in light of the Supreme Court's decision in Shurtleff, which lays out government speech factors. I'll hit a few for you right now. There is no reason to believe that the public would understand that these ratings are the speech of plaintiffs. They do not appear, and reader does not require that they appear, anywhere on plaintiffs' own websites, in its storefronts. There is no rating or marking that will actually appear on any product sold by any vendor under this law. They can specifically disavow any speech that they are concerned with, and that does not compel speech under the plaintiff's definition of their own claim. That moves us into the second part of this discussion on the merits. There is no compelled speech here. Plaintiffs claim that their speech is compelled in at least two ways. They claim that it coerces plaintiffs to review books and potentially assign a rating with which they might disagree, a speculative claim. And they also claim that it forces plaintiffs to allow the agency to publish a revised rating as if it were the plaintiff's own. They are wrong for two reasons. Reader does not coerce plaintiffs to assign a rating with which they disagree, and even if it does, we have not gotten to that point now. Plaintiffs are bringing this case on a facial and as-applied basis. It's important to remember that this law cannot be stricken down on a facial basis for the reasons that the plaintiffs have pushed forward. Second, reader does not force the plaintiffs to associate with the reader rating. As we just discussed, the plaintiffs can completely disavow these ratings. They can put something on their own websites that indicate that they are complying with the state's rating system, but they do not actually associate with the speech. Again, any attempt of them to do so would be entirely contrived because there is no public association between any vendor with any particular book or any particular rating. So for them to disavow the government's speech here, they would actually be the ones associating themselves with those ratings. And regardless, even if this is speech that falls under the First Amendment, and even if it's compelled speech, there are exceptions for that. And those exceptions apply here, particularly government operations and commercial speech exceptions. Picking up on your voluntariness point earlier in Judge Douglas' question, if a vendor does choose to participate, am I correct that if a vendor categorizes even one book incorrectly, and incorrectly in the view of TEA, that vendor could be barred from selling books altogether in Texas schools? There would be several steps that would have to occur before that would take place, Your Honor. But that could take place? It could. It has not yet today, and plaintiffs are asking for this court to enjoin, they ask the district court and they're asking for this court to affirm an enjoinment against the defendants for conduct that the defendants are not currently doing. It's important to remember that. Again, this goes back to the basis of the primary issue before the court, which is jurisdictional. These claims are not right, they do not have standing to bring them. The state is willing to admit that they might be able to bring claims in the future, and they might be able to bring, as applied, constitutional claims in the future. That is just not the case today. The definitions of sexually explicit and sexually relevant, going back to Judge Douglas' earlier question she asked, the definition, definitionally, what does it mean? And you hearkened back to the definition in a reader, and in turn, those references back to the penal code. But both sexually explicit and sexually relevant, you know, they talk about material that describes, depicts, or portrays sexual conduct. And how explicit must the reference be in order to qualify as sexual conduct? Your Honor, that is something that is likely going to be developed under the current rulemaking process, which is ongoing. Again, this law has not had a chance to be developed or implemented yet. In that choice just last year, this court indicated that Texas should have the opportunity to be able to develop and implement its laws before a federal court strikes down those laws. I see that my time has expired. If there are no further questions, I'll cede my time. Okay, we'll see you back on rebuttal. Thank you. Ms. Parether, welcome. Good morning. Thank you. May it please the Court. Your Honors, I'd like to start by just clarifying some of the questions that were asked of my friend in her prior argument. One of the questions that Judge Douglas brought up was, can't they not, are they prohibited from selling books in their entirety? And the answer is very clearly yes. Under the statute, the plain language at 35.002A, booksellers are prohibited from selling any book to Texas schools until they rate all books that have been previously sold to the school districts. So this isn't about some future rating lists that are due. This is about a prohibition at this moment in time against selling any books to Texas schools if they have not rated all previous books sold. Secondly, I believe the statement was made that it doesn't apply to booksellers that don't sell sexually explicit or sexually relevant books, and that is simply not true. When you look at the re-rating provision at 35.003B, it talks about the fact, and this gets to Judge Willett's question, that if a bookseller disagrees, or if the state disagrees with a bookseller on a single rating of a single book, they are prohibited from selling any books to Texas schools. Now, I'd like to start by mentioning a fatal flaw in the state's record. That is, with regard to standing and ripeness, the state fails to address a very clear path to both of those issues, which is under contender farms. Because the plaintiffs are an object of the challenged regulation and facial challenges are ripe the moment the regulation is passed, really the court need look no further on either of these issues. This was conceded by the House sponsor of HB 900 in the amicus brief that he filed at docket 93. Further, before getting into my primary argument, I'd like to clarify one misstatement that was made with regard to the attribution of these ratings. Make no mistake, these ratings are associated with the booksellers. Under the plain language of the statute at 35.002e, the agency, being TEA, shall post each list, which is submitted by the vendors, on a conspicuous place on the TEA website as soon as practicable. And when the trial court asks the state's counsel about this at the underlying proceedings, the state explained to the trial court, the lists are attributed to the vendors because, quote, there would be no other way for the school district to know who they can purchase from. That is at ROA 945 through 946, and there is a similar discussion at ROA 901 and 902. Now, I'd like to continue by explaining to this court what this case is about. It's about booksellers being compelled to speak against their will and being forced to apply imprecise standards to promote the state's preferred message. At the beginning, you don't dispute, do you, that broadly speaking, putting this law aside, broadly speaking, the states can limit student access to sexual content, right? Yeah, the next comment I was going to make, Your Honor, was the fact that we are not disputing the state's ability to regulate curriculum or obscene speech. So they can constitutionally restrict sexually explicit material in school libraries. It depends on how that definition is written. And in this instance, Your Honor, they did not mirror the obscenity definition. It's interesting, at the trial court level, they used the terms interchangeably, but that's not how the legislature adopted it. And so what happened was, when the legislature was adopting the definition for sexually explicit, they cherry-picked definitions from the penal code, the penal code provisions dealing with child pornography, which is only in a visual medium. So we're not talking about applicability to literary works. It makes it much more difficult when you're looking at it in a completely different medium. They could have adopted the definition of obscenity, which is at 43.21a1 of the penal code, but they didn't. They actually jumped over that definition and only cherry-picked the definition of patently offensive. And we'll get into why that's a problem. But essentially, there are no guardrails in this law. They don't adopt the Miller versus California guardrail of considering artistic, political, literary, and scientific value. And they don't address considering the work as a whole, which is why it then reaches into classics like To Kill a Mockingbird and others, because there's no safeguard against reaching into those constitutionally protected works. So, Your Honors, what's happening here and why the district court correctly enjoined the rating provisions of HB 900 is because it would require the plaintiffs to forfeit their First Amendment rights just for the opportunity to continue to sell books to Texas schools. And as we've discussed under Contender Farms, 303 Creative, Speech First, there can be no doubt that booksellers have standing to bring this pre-enforcement facial challenge because they've established a credible First Amendment threat that HB 900 will compel their speech against their will. Second, I'd like to discuss the fact that HB 900 does not only require compelled speech of these booksellers, but it also forces them to do so under an impossibly vague and subjective framework that allows for arbitrary and discriminatory applications in violation of the Due Process Clause. If the state passed a law that says vendors may not sell sexually explicit material to school districts without requiring the ratings, without the compelled speech element to the case we have before us, if they just said, vendors, you can't sell sexually explicit material to school districts, would that be constitutional? Your Honor, again, I think it depends on how sexually explicit is defined. And unfortunately, in this statute, it is unconstitutionally vague. And I'm happy to go through all of the reasons why, not the least of which is that it doesn't mirror the obscenity definition. Go through those. Okay. I mean, put aside. Yeah, please go through those. Happy to do so. We're not talking about the ratings. We're just talking about definitionally where you believe the state fell short. Right. So if you look at the statute, it's unconstitutionally vague in a myriad of ways. First, with regard to what has to be rated by the booksellers. And then second, how the ratings apply. So very briefly, with regard to what has to be rated, HB 900 requires vendors to rate every book ever sold. It is not directly related to the curriculum, which is not something that vendors know. Keep in mind, these are the middlemen. These are the booksellers. They don't know what the curriculum is. That curriculum changes day to day, school to school, year to year. They're not notified. That's an impossible task. Second, they're required to rate books that are in active use. Also something they can't do. They don't know what is or isn't in active use. So if you look at the declarations in the record at ROA 54 through 88, these booksellers explain why this is an impossible task in the first instance. There are over 1,200 school districts in the state of Texas. There is no way for them to determine what is directly related to the curriculum and what is in active use. Second, even if they were able to do that and ascertain that at tremendous economic cost to them, they then have to determine how to rate the books. And there is a maze of criteria that have to be applied. If you look at our brief, pages 10 through 12, you'll see a little chart, looks a little like this, that goes through the 16 steps that have to be applied by every book vendor for every book and every passage in every book ever sold. The uncontroverted declarations explain that they don't know how to do this, that booksellers don't know how to apply this subjective criteria. But let's try, okay? Let's look at the definition of sexually explicit, which again, these definitions are cut and pasted from the penal code out of a completely different context, the child pornography context. And in that definition, which is meant to only apply in criminal proceedings for visual works, not expressive works, like we're talking about here. It says that you look at whether or not the passage describes, depicts, or portrays, quote unquote, sexual conduct, which is defined under 43.25, which then brings in another term called sexual contact,  But that brings in looking at the intent of the author. How is a bookseller going to determine the intent of an author? That is an impossible task. Then if the bookseller actually says, yes, this is sexually relevant, I think this passage of this book is sexually relevant, let me see if it's sexually explicit. Because in order for it to be sexually explicit, you have to have first determined it is sexually relevant. So you move on to the definition of sexually explicit, which is at 33.021A. And that definition is not tethered to the definition of obscenity. Instead, it looks to whether or not the passage is patently offensive, which then brings in current community standards. Now, in the penal code context, you have jurors, local jurors in their community looking at the current community standards. Under the existing regime in Texas school libraries, you have librarians who are familiar with local communities. In the American Library Association submitted an amicus brief in this case that goes through the training and their ability to take into consideration the different needs of different communities. But what this statute does is it requires booksellers, independent booksellers, national booksellers, some of whom do not live in the state of Texas, to somehow opine about what the current community standards are in this state. Once again, an impossible task. This is not akin to a juror in a penal code setting. In the Women's Medical Center of Northwest Houston versus Bell case, this court said very clearly that statutes like this are unconstitutionally vague when they rely on the subjective viewpoints of others. So once we go through the sexually relevant piece of it and the sexually explicit piece of it, and this is for every passage of every book ever sold before you have the opportunity to sell a single book to Texas schools, you then have to go through a contextual analysis. And that's contained in 35.0021 of the statute. And that contextual analysis requires for each instance of a depiction, again, without considering the work as a whole, you weigh and you balance what is characterized as highly fact-specific characteristics and unique mixes of facts. This is a blunt instrument, your honors, that treat all public schools the same and all students the same. Let me ask you the question I asked your friend. What's the relationship between the library standards portion of the statute, which is 33.021, and the rating requirement portion, 35.001? Yes, your honor. My friend was correct in that the library standards have not been enjoined. But the relationship between the two is somewhat irrelevant because the statutory provisions are the ones that set forth the ratings and that set forth the requirement for the book vendors to do the ratings. So the library standards are something that do require the incorporation of this sexually explicit definition in them. But the actual statutory obligations that are already in effect as of September 1st that require and compel my clients to speak against their will and then to accept the state's ratings when they disagree, that is already part of the statute and cannot be changed by the regulations. I have a similar question to Judge Wiener. I'm curious what connection that defendants Wong and Ellis have to readers' enforcement against these plaintiffs. Again, maybe it's confusion deriving from not knowing how the library standards relate, how they're connected to the rating system and how the library standards affect the vendors. Can you untangle that for me? Yes, Your Honor. So there's three defendants in this case, right? There's the TEA, which is ultimately responsible for collecting the list of ratings, reviewing the books, notifying the booksellers when they disagree on ratings and those have been overridden, posting these lists by booksellers, et cetera, et cetera. TSLAC and the Board of Education are also defendants and as the trial court indicated in ROA 725, they are responsible for formulating and promulgating the mandatory library standards for public schools, which will then impact how the book ratings are applied. So those rating standards do incorporate the sexually explicit definition expressly. There is a shall in the statute that says it shall incorporate that and there are actually a number of other definitions that are undefined and problematic that are required to be adopted in those library rating standards as well. As for Commissioner Morath, what is the best evidence that he has shown a willingness to enforce the law for purposes of Ex parte Young? So for purposes of Ex parte Young, Your Honor, there has to be compulsion and constraint, right? And so in this instance, we have a situation where the book vendors are being compelled to do the ratings and then if they don't do the ratings, they're being constrained by Commissioner Morath at TEA from selling any books to public schools in the state of Texas. So the compulsion and constraint here are evident on the face of the statute and here we have a situation where that compulsion and constraint under EIR, EVAC, EMS is actually presumed and there's been no evidence that they will not. In fact, they were given multiple opportunities at the trial court proceedings to say we will not enforce these standards and they did not do so. Moving on, Your Honors, to the issue, I think we were talking about the contextual analysis and how it's a blunt instrument. It doesn't treat any age differently, K through 12. So you're looking at the same books and they may be appropriate for a young adult reader but not appropriate for a kindergartner. There's no differentiation in this law concerning that. It's basically a race to the bottom. You're gonna have a situation that promotes over inclusion of these ratings to preserve relationships with TEA. So nobody wants to get blacklisted, no author wants to be tarred by a bad rating and what's gonna result is the public at large gets harmed. In addition to the harm that's being bestowed upon these booksellers, classics won't reach students. Books about uncomfortable truths that young adults need to be made aware of, books about sexual abuse, books about human trafficking, books about, unfortunately, oftentimes related drug abuse and suicide don't reach those bookshelves, which brings us to the third issue with regard to the unconstitutionality of this statute and that is that it is an unconstitutional prior restraint. What we have here is a situation where TEA and TEA alone gets to decide whether or not a book is sexually explicit and then gets pulled from the shelves of libraries throughout the state of Texas. This provides the government with complete discretion over the distribution of constitutionally protected work because we don't have the Miller versus California stopgap and no due process or ability to challenge the government's decision or judicial oversight once that happens. As to the prior restraint analysis, does the fact that vendors are trying to sell to a public school affect what standard we should apply in the prior restraint analysis? No, Your Honor, I don't believe that it does. I think that you're still dealing with, I mean, just because you're dealing with a public school or issues concerning school children, you still have to comply with the constitution and this does not do that. Other bills around the country have certainly tried to set standards for public school libraries surrounding sexually explicit material. I think we all agree what makes this bill different, what sets this bill apart is the rather unique method of enforcement, having book vendors directly involved in determining what is appropriate for students. Have any other states opted for that method of enforcement or anything like it? Or is the Texas bill a complete unicorn? The Texas bill is a complete unicorn, Your Honor, although I do believe that the sponsor has indicated that he would like to see this as a model for other states. May I quickly wrap up? Finally, Your Honors, the booksellers here are not asserting the right to have books reach library shelves. They're asserting the right to be free from compelled speech and the right to offer and distribute books without being forced to decipher incomprehensible and vague standards which themselves render the statute unconstitutional. Lastly, Your Honors, it's important to stress that unless the injunction is continued and the administrative stay is lifted, irreparable injury in the form of lost First Amendment rights will ensue. In the absence of an injunction, the financial, reputational, and constitutional effects of the required ratings will be irreversible. Even if HB 900 is ultimately overturned, this bill cannot be unwrung. Thank you. Thank you, Ms. Prather. Ms. Pollard, if you would, just add a couple of minutes to Ms. Jackson's rebuttal time just to even things out, if you would. Thank you, Judge Watt. I have just a few quick points on rebuttal. I do want to clarify, opposing counsel continues to conflate the provisions of the law. 35.002, the initial ratings, the April 1 disclosure list, that has nothing to do with section 35.003. Any enforcement or enforcement activity under 35.003, which the state continues to assert does not exist, but any activity related to the agency's ability to place a vendor on the 35.003 list, which ultimately prohibits school districts from purchasing from that vendor, has nothing to do with the initial ratings. I just want to point out for the court that opposing counsel continues to conflate those two provisions in a way that is not helpful for the court's decision. Second, opposing counsel spent most of her time talking about the definition of sexually explicit in Reader, comparing it to the obscenity definition in Miller v. California. It's important to note that the sexually explicit definition here in Reader does actually comport with Miller v. California. There is no requirement that any magic words have to be used in order to show that the statute is constitutional per Miller. It does actually incorporate the three prongs from Miller and any concern over that third prong, which is the artistic, political, scientific, and literary focus would presumably be captured in the curriculum exception. I know that opposing counsel believes that that is not the case. However, once again, we do have to see how the rulemaking plays out and allows for that definition to be included in the curriculum exception. Third, as this court recognized, Commissioner Marath has not demonstrated the sufficient willingness to enforce this law. Booksellers are asking this court to enjoin defendants from taking activity that they are not currently conducting. There is nothing that an injunction would do to remedy the plaintiff's claims because the commissioner is not taking that enforcement activity. Finally, quickly, I do want to talk about the prior restraint issue that Judge Willard brought up. Opposing counsel indicated that prior restraints in the school context do not require any heightened scrutiny or not subject to any additional limitations. It's important to note that this country has a very long history of recognizing First Amendment limitations in the school context. Certainly, school students have First Amendment rights. They do not shed those rights at the schoolhouse gate. However, there are no school students before this court today. Plaintiffs do not carry students' rights into the school context. Prior restraint, even if it was at play here, which the state argues it is not, prior restraint is permitted in the school context to allow the school to continue its very important function of protecting students, removing sexually explicit materials from school libraries, and preventing those materials from entering the school to begin with. Is the state's argument that Reader is not a prior restraint at all or just that it's not an unconstitutional prior restraint? It is certainly not an unconstitutional prior restraint. If it is a prior restraint at all, it is constitutional. That is consistent with this court's holdings in the Shiraz versus Miller case and again in that choice. I believe it was in Shiraz that this court specifically said that third parties can actually carry out the state's prior restraint conduct. So to answer your earlier question to opposing counsel, it is actually consistent with this court's holdings that third parties can do that. Finally, Your Honors, I do want to remind you that this court is not right before this court today. This case is not right before this court today. The state would encourage the court to reverse the injunction, remand to the district court with instructions to dismiss the plaintiff's claims. If there are no further questions, I will cede my time. I have a quick one. Ms. Prather spent some time talking about community standards and what standards are supposed to govern how a vendor categorizes books. And I have a question about that. They're not state standards. They're community standards. But so which community standards are supposed to govern how a vendor categorizes books? How do you define the appropriate community for communities? We're talking about a bill with border-to-border application, statewide impact. So how do you define the appropriate community when you're talking about community standards? And might it be the case ever that what passes community standards muster in El Paso might fail it in Beaumont? Judge Willett, your question was answered in the Supreme Court's case of Miller v. California. There, the court used the exact same terms, community standards, and it applied them on a statewide basis. California is very vast. It has differences between its diverse communities just the same way that Texas does. So we would say that the Supreme Court's holding in Miller v. California allows for a statewide community standard. Notably, it is interesting that plaintiffs and opposing counsel object to the curriculum exception as not being specific enough. The curriculum exception would actually look at school district by school district assessments of what materials are in at least the classrooms. And so if there's any concern over particular assessments, presumably the curriculum exception would get to that point. But to clarify and to answer your question directly, Miller v. California indicates that a statewide standard is sufficient for a community standard under the Constitution. Any other questions? Okay, Ms. Jackson, thank you very much. We appreciate counsel for both sides for the argument. And the case is submitted.